# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Independent Glass Association, Inc., Jane Roe,
Jeff Winter, and Tim Weber,

        Plaintiffs,

    v.

Safelite Group, Inc., Safelite Solutions, LLC,
and Safelite Fulfillment Services, Inc.,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Case No. 05-238 ADM/AJB

---

Jerrie M. Hayes, Esq. and Thomas H. Goodman, Esq., Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, appeared for and on behalf of Plaintiffs.

Mark Herrmann, Esq., Jones Day, Cleveland, OH, and Todd A. Noteboom, Esq., Leonard, Street and Deinard, Minneapolis, MN, appeared for and on behalf of Defendants.

---

## I.  INTRODUCTION

On July 6, 2005, oral argument before the undersigned United States District Judge was heard on Defendants Safelite Group, Inc., Safelite Solutions, LLC, and Safelite Fulfillment Services, Inc.'s (collectively, "Safelite") Motion to Dismiss and to Compel Joinder [Docket No. 2].[1]  In their Complaint [Docket No. 1], Plaintiffs Independent Glass Association, Inc. ("IGA"), Jane Roe, Jeff Winter, and Tim Weber bring a number of claims stemming from Defendants' business practices in the auto glass repair and replacement industry.[2]  Defendants' Motion to

---

[1] The Court will refer to the three Defendants collectively as "Safelite" unless otherwise noted. However, Defendants are technically three distinct business entities, each having its principal place of business in Columbus, Ohio:  (1) Safelite Group, Inc., a Delaware corporation; (2) Safelite Solutions, LLC, a Delaware limited liability company; and (3) Safelite Fulfillment Services, Inc., a Delaware corporation.  Compl. ¶¶ 14-16.

[2] Jane Roe seeks to proceed anonymously.

Dismiss and to Compel Joinder is granted in part and denied in part.

## II. BACKGROUND

Safelite Solutions and Safelite Fulfillment Services are wholly owned subsidiaries of Safelite Group, Inc.  Compl. ¶ 14.  Safelite performs several functions in the auto glass repair and replacement industry.  First, Safelite Solutions, Inc. provides third party administrator services to its automotive insurance company clients.  Id. ¶ 31.  These insurance companies instruct their customers to contact a Safelite Call Center when in need of auto glass repair or replacement.  Id. ¶ 32.  A Safelite employee then explains the details of the customer's glass coverage and aides the customer in selecting a glass shop.  Id. ¶ 35.  The second function Safelite offers is billing and invoice processing services to its clients.  Id. ¶ 46.  Many insurance companies utilize this service and require glass shops to submit their invoices directly to Safelite for processing and payment.  Id. ¶ 47.  Third, Safelite Fulfillment Services operates its own glass shops, providing auto glass repair and replacement services directly to consumers.  Id. ¶ 29.  Fourth, Safelite oversees a national network of glass shops (the "Network").  Id.  The Safelite Network comprises approximately 11,000 glass shops throughout the nation, including several in Minnesota.  Id.

IGA, an Illinois non-profit corporation with its principal place of business in Hopkins, Minnesota, is a trade organization of roughly 400 independently owned businesses that operate approximately 1,600 glass shops throughout the United States.  Compl. ¶ 1.  Winter, a Minnesota resident, and Weber, a Nebraska resident, have recently made claims to their respective insurance companies, both Safelite clients, for auto glass replacement.  Id. ¶¶ 6-9.  Roe, a Minnesota resident, is an independent insurance claims adjustor licensed in Minnesota and often works with Safelite's insurance company clients.  Id. ¶¶ 3-4.

On January 26, 2005, Winter's windshield was cracked by a rock.  On January 29, 2005, Winter called the "1-800" number provided to him by Progressive Insurance, his insurer, in order to initiate the glass repair/replacement process.  Winter Aff. ¶ 2 [Docket No. 12].  Winter's call was answered by someone identified only as "LaFonda," an employee of Safelite. Winter was unaware that Safelite was the entity in control of the 1-800 number when he had this initial conversation.  Id. ¶ 3.  After asking Winter several questions and verifying his insurance coverage, LaFonda told him that she was prohibited by law from pressuring him to use a particular glass shop, and asked if there was a specific shop that he wanted to use.  Id. ¶¶ 4-5. When Winter informed her that he preferred to use Rapid Auto Glass, a local glass repair shop, LaFonda told him that Rapid was not a part of their Network and that he might need to pay out of his own pocket if Rapid charged more than his insurance would cover.  Id. ¶ 6.

Concerned about having to pay out of pocket for his windshield replacement, Winter again called Safelite Solutions on January 29, 2005, after his conversation with LaFonda.  Id. ¶ 7.  A Safelite employee identified only as "Tracy" repeated LaFonda's statements that Rapid was not a part of their preferred Network and that Winter would be responsible for any charges above the "fair and reasonable" insurance sum of $512.83.  Id. ¶ 10.  Tracy told Winter that he would need to use a preferred provider to take full advantage of his auto insurance coverage and asked him if she should schedule the work with a member of the preferred Network.  Id. ¶ 11.  Winter told LaFonda that he still wanted to use Rapid.  Id.  Rapid replaced his windshield, and Winter states that he was satisfied with the job and that he was not charged any out of pocket fee.  Id. ¶ 12.

Plaintiffs allege that the practices described above constitute illegal "steering" of customers away from their glass shops to Safelite's preferred Network of shops.  Winter and

3

Weber, who had a similar experience when seeking to use the Nebraska glass shop of his choice, bring this action in a representative capacity for themselves and all other insured customers similarly situated and affected by Safelite's "steering" and other, allegedly illegal, business practices.

Plaintiff IGA asserts that its member glass shops have also been injured by Safelite's "steering."  Plaintiffs allege that, if a customer tells a Safelite Call Center employee that he or she wants to use an IGA member glass shop rather than a Safelite Network member glass shop, the Safelite employee makes one or more of the following representations about non-Network glass shops:  (1) the services may not be guaranteed or warranteed; (2) the glass installers may not be as well trained; (3) the materials used in the repair or replacement may not be of high quality; (4) the customer may have to pay an amount out of pocket; (5) the glass shop is not "approved," "recommended," or "authorized"; (6) using a non-Network glass shop might cause the customer's insurance premiums to rise or the insurance policy to be cancelled.  Compl. ¶ 39. Plaintiffs state that these representations "are often false, misleading and deceptive."  Id. ¶ 40. Specifically, IGA asserts that, despite having been provided with a list of IGA glass shops that will not charge customers out of pocket, Safelite persists in making the representation that such a payment is possible.  Id. ¶¶ 42-43.  IGA claims that these representations, and the resulting "steering" away from IGA member glass shops, directly reduce the business received by these shops.  Id. ¶ 44.

IGA also asserts that its member glass shops are harmed by Safelite's bill processing procedures.  Many of Safelite's insurance company clients require glass shops to submit their invoices directly to Safelite for processing and payment.  Glass shops may submit their invoices to Safelite through either the mail or an electronic invoicing system.  Id. ¶ 48.  Plaintiffs allege

that, after receiving each invoice, Safelite makes a determination as to the price that should be paid to the glass shop, and that this price is almost always less than the price charged in the invoice.  Id. ¶ 50.  This process allegedly "results in the systematic short paying and delay of payment of virtually every [i]nvoice for every [j]ob performed by IGA glass shops on every [c]laim submitted to and adjusted by Safelite."  Id. ¶ 51.  The glass shops claim they refuse to pass this loss along to their customers and have been absorbing the loss because the amount at issue for each invoice is usually less than the cost of challenging the short pay.  Id. ¶¶ 52-54. Plaintiffs state that this process results in reduced service and quality for customers, and eventually drives glass shops out of business.  Id. ¶ 54.

Another contested element of Safelite's billing procedure is the "paper invoice service fee" that was implemented on or about November 1, 2004.  Id. ¶ 56.  Under this procedure, glass shops that chose to submit their invoices in the mail, as opposed to electronically, were assessed a fee of up to $15.00 per invoice.  Id.  According to the Plaintiffs, Safelite collects this fee by "merely withholding that amount from the amount otherwise due to the glass shop," thereby reducing even further the amount received by the glass shop.  Id. ¶ 57.  While acknowledging that Safelite has recently "suspended" its paper invoice service fees, Plaintiffs allege that Safelite "threatens to reinstitute such fees in the near future."  Id. ¶ 58.

Plaintiffs allege that Safelite's provision of third party administrator services to its insurance company clients "constitutes insurance claims adjusting, for which a license is required under Minn. Stat. §72B.01, et seq, . . . and the relevant counterparts to such legislation in various States in which Safelite does business."  Id. ¶ 61.  Plaintiff Roe brings this action "in a representative capacity for herself and all other licensed insurance adjusters similarly situated and affected" by Safelite's business practices and unlicensed claims adjusting.  Id. ¶¶ 71-77.

5

Plaintiffs allege they are harmed because Safelite's unlicensed claims adjusting allows it to engage in the contested business practices without the oversight of regulatory enforcement.

Based on these facts, Plaintiffs assert a number of claims against Defendants, including: (1) Lanham Act violation; (2) false advertising; (3) common law fraud; (4) Consumer Fraud Act violation; (5) deceptive trade practices; (6) unlicensed claims adjusting; and (7) conversion. Plaintiffs also seek to recover attorney's fees.

Pursuant to Rule 9(b) and Rule 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure, Defendants move to dismiss Plaintiffs' Complaint.  Defendants also move, pursuant to Rule 19(a), to compel joinder of the insurance companies as parties needed to ensure just adjudication of Plaintiffs' claims.

## III.  DISCUSSION

### A.      Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

### B.      Count I: Lanham Act Violation

6

Plaintiff IGA claims Safelite violates the Lanham Act, 15 U.S.C. § 1125, by making representations intended to "steer" customers away from IGA member glass shops.[3]  Compl. ¶¶ 79-83.  To bring a Lanham Act claim, IGA must first establish it possesses associational standing.  Safelite asserts that IGA fails to meet the criteria necessary for associational standing because the truth or falsity of the representations Safelite allegedly made to customers about IGA member glass shops must be resolved on a glass shop-by-glass shop basis.

The Supreme Court has established a three-part test for associational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

IGA cannot satisfy the third prong of this test.  Several statements made in the Complaint indicate that Safelite's alleged representations are not false as to all IGA member glass shops, thus indicating that individualized proof is required and that associational standing is inappropriate in this case.  For example, IGA pleads that "many IGA member Glass Shops . . . guarantee and warranty both their component materials and their labor to the same or better extent than that of Safelite Network shops," and that "the vast majority do not bill or collect from [i]nsured [c]ustomers for any glass repair or replacement costs that the customer's insurance company . . . fails to pay."  Compl. ¶ 41 (emphasis added).    In an effort to eliminate "steering," IGA provided Safelite with a list of its members that allegedly meet these criteria.  See id. Ex. A.

---

[3] To resolve any ambiguity in the wording of the Complaint, the parties now agree that Plaintiff IGA, and not the individual Plaintiffs, asserts a Lanham Act claim.

However, Defendants proffer that several glass shops on the list require customers sign invoices with language obligating them to pay any amounts their insurance companies do not pay.  Kipker Decl. [Docket No. 17] ¶¶ 3-5.[4]   At oral argument, counsel for IGA admitted that it cannot say all of its members guarantee and warranty their work or promise that they will not bill the customer for the cost of glass repair not covered by the customer's insurance company. Determining which members meet the aforementioned criteria requires individualized proof.

IGA argues individualized proof is unnecessary because it seeks declaratory or injunctive relief as opposed to compensatory damages to individual members.  In support of this position, IGA relies on language that  "[t]he Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual members.  The Court has distinguished such requests from requests for individual damages for association members."  Hosp. Council of Western Pennsylvania v. City of Pittsburgh, 949 F.2d 83, 89 (3d Cir. 1991).  However, the Supreme Court cases the Third Circuit relied upon in making the above statement involved broad questions of law in which the associations' members shared a common interest.  See Pennell v. City of San Jose, 485 U.S. 1, 7 n.3 (1988) (holding that the facial challenge an association made to a municipal ordinance did not require the participation of individual members); UAW v. Brock, 477 U.S. 274, 287-88 (1986) (holding that the participation of an association's individual members was not required because the suit raised a pure question of law).  Conversely, the instant case involves individualized questions of fact that are particular to each IGA member.

---

[4]  In determining whether subject matter jurisdiction exists, a court may properly consider materials outside of the pleadings without converting the motion into a Rule 56 motion.  Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990).

Safelite is entitled to require the glass shops to present individualized proof before being faced with a blanket injunction applicable to its statements regarding all IGA member glass shops.  Granting IGA associational standing to bring its Lanham Act claim is inappropriate in light of the specific nature of the allegations.  For the reasons stated above, including the fact that none of the other Plaintiffs bring claims under Count I, the Lanham Act claims are dismissed.

## C.    Count II: False Advertising

Both IGA and Winter argue Safelite's actions constitute a false advertising violation of Minn. Stat. § 325F.67.  The statute broadly prohibits any person, firm, corporation, or association from making an untrue, deceptive or misleading material assertion, representation or statement in the sale or disposition of merchandise, securities or services.  Id.  The statute does not provide a private right of action to individual consumers in "one-on-one" transactions.  However, in certain circumstances, Minnesota's Private Attorney General Act ("private AG act") authorizes private enforcement of the false advertising act to secure a public benefit.  Minn. Stat. § 8.31.

For reasons concerning individualized claims, previously discussed with regard to the Lanham Act claim, IGA's false advertising claim fails for lack of associational standing.  In addition, Minnesota courts have held Minn. Stat. § 325F.67 does not apply where the plaintiff is not a consumer.  See Huntting Elevator Co. v. Biwer, No. C9-98-548, 1998 Minn. App. LEXIS 1186, at *6 (Minn. Ct. App. Oct. 27, 1998).  IGA does not purchase or obtain services or products from Safelite and is suing in its capacity as an association and not a consumer.  As a result, IGA's false advertising claim must be dismissed.

Safelite contends Winter's false advertising claim must be dismissed because Winter

cannot demonstrate he has brought his false advertising claim for the public benefit.  The private

AG act allows private citizens the right to act as a "private" attorney general, taking on the role

and duties of the attorney general in defending private claimants from fraudulent business

practices.  Ly v. Nystrom, 615 N.W.2d 302, 311 (Minn. 2000).  As a result, "the purpose of any

statute granting private citizens authority to bring a lawsuit in lieu of the attorney general, is the

protection of public rights and the preservation of the interests of the state."  Id. at 313.  Thus, to

adequately state a claim under the private AG act, "the public interest must be demonstrated."

Pecarina v. Tokai Corp., No. 01-1655, 2002 WL 1023153, at *5 (D. Minn. May 20, 2002); see

also Zutz v. Case Corp., No. 02-1776, 2003 WL 22848943, at *3 (D. Minn. Nov. 21, 2003).

Safelite argues that Winter is unable to demonstrate that he is pursuing a public benefit

because the relief Winter seeks would force consumers (either directly or indirectly through their

insurance companies) to pay approximately $200 more for each auto glass repair or replacement

job.  See Defs.' Mem. in Supp. of Mot. To Dismiss and to Compel Joinder [Docket No. 3] at 19.

According to Safelite, "the primary 'benefit' from this lawsuit would be the commercial benefit

to IGA glass shops that want to charge higher prices to consumers and their insurance

companies."  Id.

The Court is not persuaded by Safelite's narrow interpretation of "public benefit."

While consumers and their insurance companies might hypothetically face higher costs if this

suit is successful, Safelite's alleged business practices impact consumers in diverse ways.  Other

factors of importance for auto glass customers include receiving accurate information about their

policy coverage and retaining the freedom to choose their desired glass shop.  If successful, this

suit might also encourage more competition in the auto glass replacement industry and

ultimately drive prices down.  These factors also constitute public benefits under the private AG

10

act.

At this early juncture in the lawsuit, Winter's false advertising claim survives while all other False Advertising claims are dismissed.[5]

### D.     Count III: Common Law Fraud

Plaintiffs IGA, Winter and Weber next claim Safelite's conduct amounts to common law fraud.[6]  "In order to successfully demonstrate fraud under Minnesota law, a plaintiff must prove that: (1) the defendant made a false representation about a past or present fact; (2) the false representation was material and susceptible of knowledge; (3) the defendant knew the representation was false or made the representation without knowing whether it was true or false; (4) defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; and (6) the plaintiff suffered damages due to the representation." Masepohl v. American Tobacco Co., 97 F.Supp. 1245, 1250 (D. Minn. 1997) citing M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992).

For reasons already discussed, IGA's common law fraud claim fails for lack of associational standing.  Winter and Weber's claim also fails because they are unable to establish the elements listed above as (5) and (6): reliance and harm.  While Winter and Weber plead that they were given false information by Safelite about their glass shops of choice, they fail to plead that they actually relied upon this information and switched glass shops.  See Compl. ¶ 65. Instead, despite Safelite's alleged steering, both Winter and Weber repaired their auto glass at non-member glass shops.

_____

[5] The parties agree that Plaintiffs Weber and Roe do not bring a claim under the False Advertising statute.

[6] Plaintiff Roe does not bring a common law fraud claim.

In addition to failing to plead reliance or damage, Plaintiffs Winter and Weber also fail to plead their allegations of common law fraud with the particularity required by Federal Rule of Civil Procedure 9(b).  Under Eighth Circuit law, plaintiffs are required to plead "the who, what, when, where, and how: the first paragraph of any newspaper story."  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997) citing DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).  In their Complaint, Winter and Weber fall short of this standard, referring vaguely to false statements and "illegal conduct."  See Compl. ¶ 65.

For the reasons stated above, all of Plaintiffs' common law fraud claims are dismissed.

**E.     Count IV: Consumer Fraud**

Plaintiffs IGA and Winter assert Safelite's conduct is a violation of the Minnesota Consumer Fraud Act ("CFA"), Minn. Stat. §§ 325F.68 et seq.  Like the False Advertising statute, the CFA does not provide a private right of action to individual consumers in "one-on-one" transactions.  Therefore, Plaintiffs must bring their CFA claims under the private AG act. Minn. Stat. § 8.31.

IGA's CFA claim must be dismissed for lack of associational standing.  In addition, the CFA only permits consumers of the defendant's products and services to bring claims.  See, e.g., Ly v. Nystrom, 615 N.W.2d at 308.  Consequently, IGA's CFA claim also fails because it is not a consumer of any product or service offered by Safelite.

Winter also brings a CFA claim.  Safelite again argues Winter cannot demonstrate his CFA claim benefits the public, as required by the private AG act, because his suit, if successful, would result in consumers paying more for auto glass replacement.  For the same reasons discussed in Count II, the Court rejects this argument.

Safelite next argues Winter's CFA claim should be dismissed because the CFA does not

12

apply to Safelite's alleged conduct.  The CFA applies only "in connection with the sale of any merchandise," where "merchandise" includes "services" in addition to "goods."  Minn. Stat. § 325F.69(1); Minn. Stat. § 325F.68(2).  Safelite argues that Winter's CFA claim does not involve the sale of merchandise, because the statements occurred in the context of Safelite employees acting as third party administrators for Safelite's insurance company clients.

The instant case appears most analogous to Rossbach v. FBS Mortgage Corp., Nos. C3-97-1622 & C9-97-1852, 1998 Minn. App. LEXIS 374 (Minn. Ct. App. Apr. 7, 1998).  In Rossbach, the Minnesota Court of Appeals concluded that "a mortgage loan servicer is not subject to claims by mortgagors under [the CFA] because the servicer does not participate in the 'sale of any merchandise' as required by [the CFA]."  Id. at *1.  The court rejected Rossbach's argument that "FBS, in its role as mortgage servicer, provided a 'service' and is therefore subject to [the CFA]."  The Court held that FBS did not provide any services directly to Rossbach, a homeowner, but instead provided its services as an intermediary and for the benefit of the bank holding Rossbach's mortgage.  Id. at *3.  Rossbach also argued that FBS provided "merchandise" when it forwarded insurance premiums from Rossbach to an insurance company.  Id.  The court again held that FBS was merely acting as an intermediary, and that it was not selling "merchandise" directly to Rossbach.  Id.

In the instant case, automotive insurance companies contract with Safelite to provide third party administrator services to consumers in need of auto glass repair or replacement.  Safelite is fulfilling a contractual obligation of the insurance companies to assist consumers in repairing or replacing their auto glass.  Safelite provides the service for the benefit of the insurance companies, rather than the benefit of the car owner.  Therefore, Safelite does not provide any service directly to Winter, as required for his claim under the CFA.

13

Winter argues that, unlike FBS, "Safelite provides millions of dollars of goods and services directly to consumers," apparently referring to the fact that Safelite manufactures, repairs, and replaces auto glass in its own glass shops, in addition to acting as a third party administrator for its insurance company clients.  See Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 37 [Docket No. 10].  This reasoning is flawed, however, because Winter's CFA claim derives from Safelite's alleged statements made as a third party administrator, not from its role as an auto glass manufacturer, repairer, and replacer.  Safelite's conduct as a third party administrator, the only conduct relevant to Winter's CFA claim, does not constitute the sale of "merchandise."  Any "services" Safelite performed as a third party administrator were performed as an intermediary and for the benefit of its insurance company clients.

For the reasons stated above, the Consumer Fraud Act claims are dismissed.[7]

F.      **Count V: Deceptive Trade Practices**

Plaintiffs IGA, Winter, and Roe bring claims for alleged Deceptive Trade Practices, in violation of Minn. Stat. §§ 325D.43 et seq.[8]  Minnesota's deceptive trade practices statute, in relevant part, prohibits a "person" from engaging in deceptive trade practices "when, in the course of business vocation or occupation, the person . . . disparages the goods, services, or business of another by false or misleading representation of fact."  Minn. Stat. § 325D.44, subd. 8.  Again, the deceptive trade practices statute does not contain a private cause of action, but plaintiffs may bring such claims pursuant to the private AG act.  Minn. Stat. § 8.31.

For reasons previously discussed, IGA lacks associational standing to bring its deceptive

---

[7] The parties agree that Plaintiffs Weber and Roe do not bring claims under the Minnesota Consumer Fraud Act.

[8] Plaintiff Weber does not bring a deceptive trade practices claim.

trade practice claim.

Safelite claims Winter's deceptive trade practices claim should be dismissed for failure to establish the "public benefit" requirement of the private AG act. As previously discussed, the Court is not persuaded by Safelite's narrow interpretation of "public benefit." Consequently, Winter's deceptive trade practice claim survives Safelite's Motion to Dismiss.

Safelite next argues that Roe's deceptive trade practice claim must be dismissed because her anonymous pleading is improper. Federal Rule of Civil Procedure 10(a) requires that every complaint contain the name of each plaintiff. The relevant case law dictates that, with rare exception, anonymous pleading is not allowed under Rule 10(a). See, e.g., Nat'l Commodity & Barter Ass'n v. Gibbs, 886 F.2d 1240, 1245 (10th Cir. 1989) (stating that courts have permitted a plaintiff to proceed anonymously only where "there are significant privacy interests or threats of physical harm," and not where "only the plaintiff's economic or professional concerns are involved").

The claims of Roe will not be dismissed at this time for failure to reveal her identity. However, her generalized concerns about professional retaliation are insufficient to allow her anonymous standing to remain as the case proceeds through discovery. Plaintiff Roe is required within a 60 day period to amend the Complaint to identify herself as a properly named Plaintiff or submit evidence to the Court that establishes a significant privacy interest or threat of physical harm. The record to date does not meet this standard. Further, her claim to be representative of a group of similarly situated licensed insurance adjusters requires her identity to be disclosed so a comparison can be made to others.

Safelite's Motion to Dismiss the deceptive trade practice claims of Winter and Roe is denied.

15

**G.**     **Count VI: Unlicensed Claims Adjusting**

Minn. Stat. §§ 72B.01-.14, relating to Insurance Adjusters, aims "to provide high quality service to insureds and insurance claimants in the state of Minnesota by providing for well trained adjusters . . . who are qualified to deal with the public in the interest of a fair resolution of insurance claims." Minn. Stat. § 72B.01. In furtherance of this goal, the statute provides that no person shall act as an insurance adjuster "unless such person shall first obtain from the commissioner a license." Minn. Stat. § 72B.03(1).

All Plaintiffs argue that Safelite's conduct as a third party administrator for its insurance company constitutes unlicensed claims adjusting in violation of Minn. Stat. §§ 72B.01-.14. Safelite responds to this allegation by the familiar argument that the statute doe not provide a private right of action.

Neither the Insurance Adjuster statute, Minn. Stat. §§ 72B.01-.14, nor the private AG act, Minn. Stat. § 8.31, provides a private right of action for unlicensed insurance adjusting. As discussed above, under certain circumstances, the private AG act allows individuals to bring a claim when the relevant statute does not provide a private right of action. Unlike false advertising, consumer fraud, and deceptive trade practices, the private AG act does not provide a private right of action for unlicensed claims adjusting. See Minn. Stat. § 8.31(1)&(3)(a). In fact, the text of Minnesota's insurance adjusting statute specifically states that "[a] person who violates sections 72B.01 to 72B.14 . . . shall be subject to a fine imposed by the commissioner . . . ." Minn. Stat. § 72B.14 (emphasis added). The clear language of the statute precludes Plaintiffs' private claims.

For the reasons set forth above, all Plaintiffs' claims for unlicensed insurance adjusting are dismissed.

**H.      Count VII: Conversion**

IGA asserts that Safelite's collection of a "paper invoice service fee" from IGA member glass shops constitutes conversion.[9]  Compl. ¶¶ 97-98.  The individualized glass shops could either submit invoices electronically or by mail to Safelite.  Id. ¶ 56.  However, invoices submitted in the mail were charged a fee up to $15.00 for administrative processing.  Id.  Safelite collected the fee by withholding the $15.00 from the amount sent the glass shops for auto glass repair or replacement.  Id. ¶ 58.

As a threshold matter, given the injunctive relief sought, there is some question as to whether IGA and its member glass shops' conversion claim is justiciable.[10]  See McCarthy v. Ozark Sch. Dist., 359 F.3d 1029, 1035 (8th Cir. 2004) ("Under Article III of the Constitution, federal courts 'may adjudicate only actual ongoing cases or controversies'").  In its Complaint, Plaintiffs acknowledge Safelite recently "suspended" its paper invoice service fees but allege that Safelite "threatens to reinstitute such fees in the near future."  Id. ¶ 58.

Assuming, arguendo, the conversion claim is appropriately before the Cout, it is barred by the voluntary payment doctrine.  "The voluntary payment doctrine is a long-standing doctrine of law, which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment."  Hanson v. Tele-Communications, Inc., No. C7-00-534, 2000 Minn. App. LEXIS 1023, at *8 (Minn. Ct. App. Sept. 26, 2000).  In the instant case, IGA member glass shops were given a clear choice between submitting their invoices electronically, without a fee, or submitting their invoices through the

---

[9] The parties agreed at oral argument that this claim is not asserted by Plaintiffs Roe, Winter, or Weber.

[10]  IGA does not seek compensatory damages for Safelite's allegedly illegal, past conduct.

mail, for a fee.  Compl. ¶¶ 48, 56.  IGA does not allege that its member glass shops were not

aware of the "paper invoice service fee," or that its application was concealed.  The glass shops'

voluntary decision to submit paper invoices and not utilize the electronic invoice system offered

by Safelite does not state a conversion claim.  Consequently, Plaintiff IGA's conversion claim is

dismissed.

**I.      Defendants' Motion to Dismiss All Counts as to Defendant Safelite Fulfillment, Inc.**

Defendants argue that all Counts asserted against Defendant Safelite Fulfillment should

be dismissed on the grounds that Safelite Fulfillment is only "engaged in the business of

providing automobile glass repair and replacement products . . . ."  Compl. ¶ 16.  Because none

of Plaintiffs' claims directly relate to providing glass repair and replacement products,

Defendants argue Safelite Fulfillment should not be a party to this litigation.  Plaintiffs argue that

Safelite Fulfillment is a proper Defendant based on joint venture liability.  Because Plaintiffs

seek only injunctive relief, Safelite Fulfillment is not a proper party to this case.  Any potential

relief to Plaintiffs would enjoin the practices of Safelite Group and Safelite Solutions, and would

not reference Safelite Fulfillment.

For the reasons stated above, all claims against Defendant Safelite Fulfillment, Inc. are

dismissed.

**J.      Defendants' Motion to Compel Joinder Under Rule 19(a)**

Defendant Safelite argues, pursuant to Rule 19(a) of the Federal Rules of Civil

Procedure,

that the Court should compel the joinder of its insurance company clients as parties needed for

just adjudication of Plaintiffs' claims.  Rule 19(a) provides that a party is "needed for just

adjudication" if:

18

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Specifically, Defendant Safelite contends that allowing the case to proceed without joining the insurance companies risks exposing Safelite to inconsistent obligations in violation of Rule 19(a)(2)(ii).  Safelite argues that, if the Court grants Plaintiffs injunctive relief, then Safelite will be put between the proverbial rock and a hard place: forced to choose between the mutually exclusive options of obeying the injunction or fulfilling its contractual obligations to the insurance companies.  Safelite attempts to draw a parallel between the instant case and Dawavendewa v. Salt River Project Agricultural Improvement & Power District, 276 F.3d 1150 (9th Cir. 2002).  In Dawavendewa, the defendant operated a power company on land leased from the Navajo Nation.  Central to the case was a provision of the lease requiring the defendant to give priority to "local Navajos" in its hiring decisions.  When faced with an employment discrimination claim, the Ninth Circuit held the Navajo Nation was an indispensable party to the lawsuit, because the lease between the defendant and the Navajo Nation explicitly required the defendant to engage in the allegedly discriminatory conduct.  Id. at 1154.  The Ninth Circuit dismissed the case, holding that granting relief to the plaintiff without the required parties would expose the defendant to inconsistent obligations.  Id. at 1157-59.

However, there is an important distinction between the facts of Dawavendewa and those of the instant case.  In Dawavendewa, it was agreed that there was a specific contractual provision requiring, in violation of Title VII, that the defendants give preference to Navajos in its

19

hiring decisions.  Here, on the other hand, there is no evidence adduced that Safelite's contracts with the insurance companies require it to engage in "steering" or other allegedly illegal business practices.  While Safelite might have been faced with inconsistent obligations if this Court found its third party administrator functions constituted unlicensed insurance adjusting, this claim has been dismissed.

Plaintiffs' surviving claims seeks revisions to the "scripts" that Safelite uses when speaking with customers.  Specifically, Plaintiffs request an injunction ordering Safelite to stop "steering" customers via the dissemination of allegedly false information.  At oral argument, Safelite stated that the content of its scripts was approved by its clients, the insurance companies, and that ordering Safelite to alter its scripts would result in inconsistent obligations.  At this time, however, there is no evidence before the Court to suggest that the content of the scripts is dictated by the contracts between the insurance companies and Safelite.  As a result, Safelite has not shown it could not comply with an injunction prohibiting it from steering customers to Safelite glass shops without violating its contractual obligations to the insurance companies.  Consequently, Safelite's Motion to Compel Joinder is denied.

**IV.  CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Defendants' Motion to Dismiss and to Compel Joinder [Docket No. 2] is **GRANTED**

in part and **DENIED** in part.  Winter's false advertising and deceptive trade practice claims

(counts II and V) and Roe's deceptive trade practice claim (count V) survive.  All other claims

are dismissed and Defendants' Motion to Compel is denied; and

2.  Plaintiff Roe has 60 days to amend the Complaint to identify herself as a properly

named Plaintiff or submit evidence to the Court that establishes a significant privacy interest or

threat of physical harm.

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE


Dated:  August 26, 2005.